UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MICHAEL RECH,

                                        Plaintiff,

                                                            Case # 17-CV-6418-FPG
v.
                                                            DECISION AND ORDER

COUNTY OF MONROE, et al.,

                                        Defendants.

## INTRODUCTION

The facts underlying this case arose during a child-custody dispute between the Plaintiff Michael Rech ("Rech") and his ex-wife, Jennifer Szczublewski ("Szczublewski"), regarding their son, "LR." At the outset, the Court acknowledges that such disputes are often difficult for parents and fraught with emotion. Were Rech seeking to vindicate rights related to child custody or rights of visitation, this Court would not have jurisdiction. *See Neustein v. Orbach*, 732 F. Supp. 333, 339 (E.D.N.Y. 1990) ("[F]ederal courts do not adjudicate cases involving the custody of minors or right of visitation [because t]hat is the function of the States.") (citation omitted). Instead, this case is properly before this Court for the limited purpose of determining whether the Defendants are liable for violations of Rech's civil rights under 42 US.C. § 1983.

Rech has sued Defendants Monroe County, New York ("Monroe County"), Monroe County Assistant District Attorney Daniel Strollo ("Strollo"), the Monroe County Sheriff's Office ("MCSO"), and MCSO officers Christopher Fay ("Fay"), Daniel Phillipp ("Phillipp"), George Wilczak ("Wilczak"), Kenneth Weber ("Weber"), and Joshua DeRuyter ("DeRuyter"), and "other unknown employees of Monroe County and MCSO," all in their individual and official capacities.

ECF No. 31.  His claims arise principally from a March 2016 encounter with police officers at his home, his subsequent prosecution on state charges related to that encounter, and an unrelated July 2016 encounter with police.

Presently before the Court is Rech's omnibus motion seeking (1) recusal of United States Magistrate Judge Marian W. Payson; (2) a finding of fraud on the court; (3) sanctions against the Defendants; (4) leave to amend the Amended Complaint; and (5) to reopen discovery.  *See generally* ECF No. 96; ECF No. 97.   Also pending before the Court is Defendants' motion for summary judgment as to all claims, ECF No. 93.  For the reasons that follow, Rech's motions are DENIED and Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

The following facts are undisputed unless otherwise noted.  Where disputed, the facts are taken in the light most favorable to Rech.

## I.   March 2016 Incident

On March 15, 2016, Defendants DeRuyter and Phillipp, along with Civil Deputy Andrew Loughlin, Civil Deputy Blake Phillips, and Road Patrol Deputy Parker Blackburn arrived at Rech's home to carry out the transfer of LR to Szczublewski.[1]  ECF No. 93-1 at 3.  They were acting pursuant to a March 15, 2016 Order (the "Entry Order") issued by Acting Monroe County Supreme Court Justice John Owens which stated that, in the event LR was not returned to Szczublewski by 4:00PM that day, "then the Monroe County Sheriff's Office is directed and authorized to immediately enter [Rech's] home . . . to effectuate the return of [LR] to [Szczublewski]."  ECF No. 93-9 at 32-33.

---

[1] Loughlin, Phillips, and Blackburn were not named as Defendants in this matter.

Among the evidence proffered by the parties related to the March 15, 2016 encounter is an audio recording made by Rech.  ECF No. 93, Exhibit 18.[2]   "Although on summary judgment the evidence must be viewed in the light most favorable to Plaintiff[ ] as the non-moving part[y], when there is reliable objective evidence—such as a recording—the evidence may speak for itself." *Marcavage v. City of New York*, 689 F.3d 98, 110 (2d Cir. 2012).   Where there exists "a discrepancy between the parties' versions of the facts and a recording of the incident, a court may rely on an unaltered . . . audio recording." *Burwell v. Peyton*, 131 F. Supp. 3d 268, 293 (D. Vt. 2015).

The audio recording is approximately four minutes long.  It begins with Rech stating "today is Tuesday, March 15, 2016, 5:08PM."  At the 54 second mark, the doorbell rings.  This comports with DeRuyter's account of the events, which indicates that, upon arrival at Rech's home, he rang the doorbell and Rech came to the door.  ECF No. 93-3 at 4.  A door can be heard opening at the 1:07 mark, and Rech then says "What's going on?"  As indicated in DeRuyter's declaration, Rech had opened the main door and was speaking to DeRuyter through a locked glass storm door.  *Id.*

DeRuyter responds to Rech, though it is muffled on the recording—presumably because he is on the other side of the glass—and asks "mind talking for a minute?"  Rech says in reply, "no go ahead."  DeRuyter then asks, "can you open the door for me so I can talk to you for a minute?"  Rech declines to open the storm door,  replying "I can hear you.  DeRuyter responds, "I don't think you can hear me," followed by something inaudible.   Rech then says, "I'm willing to talk, hang on."

---

[2] Exhibit 18 is a Compact Disc which contains an audio file.  The Exhibit is on file with the Court.  Rech asserts that he "never received Defendants' alleged exhibits # 17 and 18 on disc, yet [they] [sic] state in their summary judgment motion papers they have provided them to this Court."  ECF No. 97 at 19.  However, Exhibit 18 is a recording which Rech made and provided to Defendants during discovery.

DeRuyter then asks again, "please open the door for me so I can speak with you." Rech responds, "I'm good." DeRuyter then orders, in a slow and deliberate tone, "Michael—I need you to open the door with me so I can speak to you." Rech replies something to the effect of "do you have any papers or anything," though his exact statement is difficult to make out on the recording. DeRuyter replies, "Yup I do." This portion of the audio accords with DeRuyter's declaration, in which he asserts that Rech wanted to see a copy of Judge Owens's Order, so DeRuyter showed it to him through the glass. *Id.* DeRuyter avers that Rech then opened the storm door so that the officers could give him a copy of the Order. ECF No. 93-3 at 4. At the 1:37 mark of the recording, a noise that sounds like a door handle opening can be heard, thus the recording once again aligns with DeRuyter's account at that point in time.

Once the door is open, Rech states "I'm not here to cause problems I'm just asserting my rights." DeRuyter answers, "I understand that you're doing that man," his voice is much clearer and louder now—further supporting that the glass storm door was now open. DeRuyter avers in his declaration that once Rech opened the storm door, he "immediately stepped inside the house so that he would not shut the door on me and prevent us from complying with the Judge's Order to remove his son." *Id.*

DeRuyter then informs Rech, "we have an updated order, unfortunately, from the Judge, that states that you have to turn over [LR] to us right now." Rech responds, "to you guys?" DeRuyter replies, "yes." Rech then says "well I haven't seen anything," to which DeRuyter replies, "I understand, we're going to give it to you right now," seemingly in reference to the Entry Order. "Can I have a chance to read it?," Rech asks, and states immediately after that statement "don't touch me." DeRuyter indicates in his declaration that, at this point in time, he was "directing [Rech] towards a dining table that was near the front door." *Id.*

Next, DeRuyter says "you're not going inside without us."  Rech asks in reply, "do you have a search warrant?," to which DeRuyter responds, "yes it's in here, so either you're going to take it down a little bit or—" Rech cuts DeRuyter off and says "OK, let me talk to you guys," to which DeRutyer says "yup."  Despite DeRuyter's assertion that he had a "search warrant," the undisputed facts in the record indicate that he and his fellow officers had the Entry Order, not a search warrant.  Rech next says "I have concerns that nothing has been addressed."  DeRuyter says in reply "alright, listen, Michael, I understand that but we have concerns as well."  The two talk over each other and then Rech is heard saying "may I speak?"  DeRuyter says "yes," and Rech asks "am I under arrest?"  DeRuyter replies, "If you aren't going to cooperate with this order then you'll be under arrest, yes."  This portion of the audio is supported by DeRuyter's declaration in which he avers that he informed Rech "that he would be arrested if he did not turn over his son." *Id.*

Rech then asks, "what law am I violating?" In response, DeRuyter states "you're going to be violating the Judge's order which is criminal contempt, OK."  Rech then asks "what assures [LR's] safety because he's getting beat up by my ex and her boyfriend?"  DeRuyter responds, "ok well at that point you're going to have to contact social services or CPS.  I'm not saying that you don't have any valid concerns."  The two then talk over one another again and then Rech is heard saying "Timeout, who are you guys what are your names."  In response, DeRutyer says "we're the Sheriff's Office."  The audio in indiscernible as the two talk over one another again until DeRutyer can be heard clearly asking "where is your son?" and Rech is heard in reply, asking "can I have a name?"  DeRuyter replies, "yes, Joshua DeRuyter."  Another officer is heard responding with his name.

DeRuyter then says "listen, we are not having a discussion here, so either you are going to tell me where your son is and we're going to retrieve [LR] and I can sit and talk to you about this, or you are going to get arrested."  This portion of the audio corroborates DeRuyter's assertion that he explained to Rech that his fellow officers would be removing LR and that DeRuyter could discuss the Order with Plaintiff.  ECF No. 93-3 at 5.  Rech replies, "alright where's he going to go?"  DeRuyter explains in response that LR will be handed over to Szczublewski.

DeRuyter then states, "do you have any—where is [LR]?"  Rech's voice is heard more agitated and he says "wait a second guys."  This lines up with Derutyer's averment that Rech became agitated and "refused [DeRuyter's] requests to move out of the doorway" so that other officers, in addition to DeRuyter, could enter the home.  *Id.*  However, DeRuyter is not heard *expressly* requesting that Rech "move out of the doorway," as he indicates in his declaration.  *Id.* According to DeRuyter, Rech "began raising his arms aggressively to shoulder height" at this point in time.  *Id.*

DeRuyter then states, "Listen you are going to be arrested if you don't—" and Rech cuts in and, speaking loudly, retorts "I want to read this," seemingly in reference to the Entry Order, and goes on to state "you can't just put it in my face and—" DeRuyter cuts Rech off and says "I understand that you want to.  Have a seat over here and we can sit down over here and talk about it," with "over here" seemingly a reference to the dining table that DeRuyter mentions in his declaration.

According to DeRuyter's account he next "placed [his] hands on [Rech's] left shoulder and arm," and, as he did so, he "could feel [Rech] tensing the muscles in his arms."  *Id.*  at 5.  On the audio, the two talk over each other and then Rech is heard loudly saying "OK, OK stop. OK, OK stop. I don't want conflict. Relax."  DeRuyter then says, "put your hands down otherwise you're

going to get arrested." Rech replies, "Well keep your hands off me." DeRuyter again asks Rech to sit down and talk about the Entry Order, stating "I'm not going to have this debate right here, right now." This, again, accords with DeRuyter's averments that he was attempting to get Rech to sit at the dining table to discuss the Entry Order so that other officers could enter the home and facilitate LR's removal.

DeRuyter then is heard asking Rech if he has any weapons on him. Rech responds that he has a knife in his pocket. Based on that response, DeRuyter sought to perform a pat down, explaining in his declaration that it is "[his] practice to ask suspects or detainees if they have weapons on them and [to] always pat them down," and that he sought to perform this procedure because he was "familiar with [Rech] and with some of his history with law enforcement ," and, based upon that, thought Rech "could respond to [officers] in a hostile manner." ECF No. 93-3 at 5-6. DeRuyter is heard on the audio stating, "OK, do me a favor, I'm going to pat you down for weapons," the two talk over each other and Rech is then heard refusing DeRuyter's pat-down request, followed by "OK, OK" repeatedly.

According to DeRuyter's declaration, a struggle ensued and DeRuyter began pulling Rech to the ground by his left arm. ECF No. 93-3 at 6. As other officers entered the home, DeRuyter saw Rech "throw a right handed punch at the deputies entering the house." *Id.* According to DeRuyter, the punch missed the deputy it was intended for, but struck another officer "in the face and forearm." *Id.*

Based on their declarations, fellow officers then assisted DeRuyter in taking Rech to the floor. ECF No. 93-4 at 5. Phillipp avers that he used his left arm to perform a "hooking technique" to assist in taking Rech to the floor. *Id.* The audio finishes with what sounds like a person's body

hitting the floor, people struggling, Rech screaming "help" repeatedly, and a child shouting "daddy," as officers are heard yelling, "Michael."

Though not portrayed in the audio, the officers' declarations indicate that, once on the floor, Rech "continued to fight." so Phillipp threatened to tase Rech if he did not stop resisting. ECF No. 93-4 at 5. Rech attempted to get up on his hands and knees, so DeRuyter performed a "knee strike" on Rech's left outer thigh. ECF No. 93-9 at 6. Once Rec was on his stomach DeRuyter "performed ground stabilization" and subsequently handcuffed Rech. ECF No. 93-3 at 7. Rech "continued to be non-compliant and struggled with DeRuyter and Road Patrol Deputy Blackburn." *Id.* Rech "was eventually handcuffed by DeRuyter[,] helped to his feet and placed in a chair." *Id.*

Rech disputes some aspects of this encounter. First, though he does not give a detailed alternative account of what unfolded, he states in a conclusory manner that he did not "actively" resist arrest. *See* ECF No. 97 at 28.[3] He also asserts that officers had their firearms drawn, ECF No. 97 at 29, ECF No. 99-2 at 7, while DeRuyter and Phillip each affirmed in their respective declarations that none of the police officers present at the Rech's home during the March 2016 incident drew their weapons at any time and that none of the officers pointed a gun at Rech. ECF No. 93-3 at 7; ECF No. 93-4 at 6.

## II.   Subsequent Detention

The officers arrested Rech and transported him to the MCSO's C Zone substation. ECF No. 93-1 at 4. He was charged with Obstructing Governmental Administration in the Second Degree, NY Penal Law 195.05, Resisting Arrest, NYSPL 205.30, and Harassment in the Second Degree, NYSPL 240.26(1) (together, the "State Charges"). ECF No. 93-1 at 8. Phillipp and

---

[3] Due to Rech's *pro se* status, the Court has liberally construed his filings and reviewed them for factual disputes throughout his briefings, rather than strictly construing his Rule 56 statement and affidavit alone as the sole source of potential factual disputes.

DeRuyter each completed a "Subject Management Resistance Report" related to the force they used on Rech while taking him into custody.  ECF No. 93-3 at 7; ECF No. 93-4 at 6.  They also each prepared a "Crime Report."  *Id.*

Once at the C Zone substation, Rech spoke to Road Patrol Captain Fay.  ECF No. 93-5 at 3.  Fay spoke with Rech while he was in a holding cell.  *Id.*  Fay avers that he asked Rech if he was injured and Rech responded that "he was not injured and did not want to be seen by ambulance personnel" who had responded to the substation.  *Id.*  Despite Fay's account that Rech told him he was uninjured, Rech asserts that he was in fact injured.  ECF No. 97 at 17.  According to Rech, he suffered "extreme bruising and swelling on [his] lower extremities" and "bruises on [his] entire body."  *Id.*  He also states that he "was unable to walk properly for several weeks" and that he "received medical evaluations and treatments from [his] primary care physician" which were "disclosed via discovery."  *Id.* at 17-18.  The Subject Management/Resistance Reports in the record state that Rech was injured and that he complained of pain in his left leg.  ECF No. 93-9 at 70.

Fay subsequently completed a "Subject Management Justification Report" in which he reviewed the use of force reports by DeRuyter, Blackburn, Phillips, and Phillipp, concluding that their "use of force was justified and appropriate."  ECF No. 93-5 at 4.

### III.   Prosecution on State Charges

Rech's State Charges related to the March 2016 incident were prosecuted by Strollo.  Judge Litteer of the Wheatland Town Court dismissed the State Charges "on the rationale that law enforcement, in entering the defendant's home and arresting the defendant for refusing to hand over his child pursuant to a custody order of Acting State Supreme Court Justice Owens, had committed a "*Payton*" violation, *i.e.*, a violation of the Fourth Amendment, ECF No. 93-1 at 5; ECF No. 93-9 at 81.

On appeal by the People of the State of New York, Monroe County Supreme Court Justice Christopher S. Ciaccio affirmed the dismissal of the State Charges in a May 17, 2017 Opinion of the Court, albeit on different grounds.[4]  ECF No. 93-1 at 5; ECF No. 93-9 at 84.  Justice Ciaccio assumed that dismissal of the State Charges by Judge Litteer was based upon the sufficiency of the accusatory instrument, since the remedy for a *Payton* violation would have been suppression— not dismissal—and because "[n]owhere in the accusatory instrument or the papers attached to it is there even an allegation let alone a factual statement, that the deputies entered the [Plaintiff's] house." *Id.* at 83.  Accordingly, Justice Ciaccio's Opinion was premised on his finding that "the [Entry Order] directing the [MCSO] to enforce its mandate to have the defendant return the child to his mother was unauthorized and unenforceable"  because (1) "there [was] no proof attached to the accusatory instrument that the order was served on the defendant within the time required," and (2) "the order was not a warrant . . . and gave no authority to the deputies to seize the defendant upon his refusal to deliver the child, let alone notice to the defendant that he was subject to arrest for his failure to comply." *Id.*  Thus, Justice Cicaccio reasoned as follows:

> What [the Supreme Court] could not do, absent the issuance of a valid warrant founded upon probable cause, was to authorize law enforcement to seize the defendant and take his child from him, within or without his house, in other words, to act with the authority of a warrant.  The order having exceeded the bounds of Supreme Court's authority, it was not valid on its face and thus the deputies were not carrying out an "official function."  The arrest was thereby unlawful.[5]

*Id.*  Accordingly, the dismissal of the State Charges was affirmed on different grounds.  ECF No. 93-1 at 5.

---

[4] *People v. Rech*, 56 Misc. 3d 490, 52 N.Y.S.3d 849 (N.Y. Co. Ct. 2017).

[5] Justice Ciaccio also noted what the Supreme Court *could have* done within the bounds of its authority: It "could have issued a warrant upon a showing that the defendant was unlikely to respond to a summons issued pursuant to the custody petition (*see* Family Ct Act § 671).  It could have issued an arrest warrant upon a finding of contempt following a hearing, in the event the defendant refused to give up the child and was unlikely to appear for the hearing."  ECF No. 93-9 at 83.

**IV.    July 2016 Incident**

Rech also brings claims arising from a separate encounter with police officers in July 2016. ECF No. 31 at 5-6.  According to Rech's Amended Complaint, one evening he saw two men "exhibit[ing] 'peeping tom' behaviors" on the other side of the fence that encloses his backyard. *Id.* at 5-6. He later learned that these men were officers Wilczak and Weber. *Id.* at 6. Rech alleges that he saw "only a bald head of a man popped over the 6-foot high solid wood fence." *Id.* He further alleges that the man used a flashlight and "startled, surprised, intimidated, and harassed [him] and his female friend, making them both fearful!" *Id.* at 6.  Rech alleges that an MSCO Lieutenant "admit[ted] the behaviors were extremely inappropriate and violated New York State laws and [MCSO's] policies" and that "disciplinary actions [had] been taken against them." ECF No. 31 at 6.

Wilczak and Weber submitted declarations into the record providing their account of that evening.  The officers' declarations each indicate that they were not present at Rech's home on the night of the March 2016 incident and had no involvement in that incident.  ECF No. 93-7 at 2; ECF No. 93-6 at 2.  They arrived at Rech's residence on July 6, 2016 when they responded to a police call related to a decorative green laser light in Rech's backyard.  ECF No. 93-6 at 2.  Wilczak and Weber entered onto Rech's property but the backyard was surrounded by a privacy fence approximately 6 feet high.  *Id.* at 3.  Weber was tall enough to see over the fence but Wilczak was not.  *Id.*; ECF No. 93-7 at 3.  Weber spoke with Rech, informing him that a neighbor had complained about the lights on the back of his house.  ECF No. 93-6 at 3.  After determining that the light was not illegal, Wilczak and Weber left.  *Id.*  As they were leaving, Rech shouted after them, "Come back on my property and I will consider it a threat."  *Id.*  Rech was not arrested or charged regarding this encounter.  *Id.* at 4.

Rech does not directly controvert the facts above.  However, he does assert additional facts, not alleged previously, in his Response to Defendants' Statement of Undisputed Facts: that Wilczak and Weber "had guns drawn and refused to identify themselves"; that they "damaged [his] property and then retaliated using their police car in a threatening manner."  ECF No. 97 at 15.  He also asserts that Wilczak and Weber used force because "[p]ointing a gun at someone is a use of force."  *Id.*

## V.     Removal of Firearms

Rech's Amended Complaint alleges a violation of his Second Amendment rights, stating that "Defendant's initiating the intentional and malicious submission of false documents, false information, and an unlawful petition that allegedly would result in the removal of firearms from Plaintiff without just cause."  ECF No. 31 at 13.  The declarations of Defendants Phillipp, Deruyter, Fay, Weber, and Wilczak all affirmatively state that they had no involvement in a petition related to a firearm or the removal of a firearm from Rech's home.  ECF No. 93-3 at 8; ECF No. 93-4 at 7; ECF No. 93-5 at 4; ECF No. 93-6 at 4; ECF No. 93-7 at 4.  These statements are undisputed in the record and uncontested by Rech's declaration.  ECF No. 97 at 17-19.

## VI.    Procedural History

Rech brought this action in New York State Supreme Court in June 2017.  ECF No. 1 at 1. Defendants removed the action to this Court.   ECF No. 1.  Rech moved to remand to State Court but that motion was denied by United States District Judge Michael A. Telesca.  ECF No. 4; ECF No. 10.  Rech filed an Amended Complaint on April 26, 2018.  Principally, he alleges that officers entry into his home on March 15, 2016 was unlawful, that his subsequent arrest and detention were unlawful, and that officers submitted false documents and information that resulted in the removal

of firearms from his home.   ECF No. 31 at 12-13.   Construed liberally, he raises the following claims against the individual Defendants.

1.      unlawful entry under 42 U.S.C. § 1983;

2.      false arrest/false imprisonment under 42 U.S.C. § 1983;

3.      malicious prosecution under § 1983;

4.      intentional infliction of emotional distress under § 1983;

5.      excessive force under § 1983;

6.      negligent infliction of emotional distress under § 1983;

7.      intentional infliction of emotional distress under state law;

8.      negligent infliction of emotional distress under state law.

*See generally* ECF No. 31.

Against Monroe County and the MCSO, Rech raises a claim for municipal liability under § 1983.

## DISCUSSION

### I.      Plaintiff's Motions

The Court addresses Rech's pending motions before addressing Defendants' summary judgment motion because Rech has sought leave to amend his Amended Complaint.  On July 29, 2021, Plaintiff filed a motion, ECF No. 96, requesting an order granting the following relief: (1) that United States Magistrate Judge Marian W. Payson "recuse and disqualify herself from the above captioned matter"; (2) a finding that "this Court has committed the serious misconduct and violation of Fraud of [sic] the Court"; (3) that he be permitted to amend his Amended Complaint to name Michele Crain and Christyn Musso as Defendants; and (4) sanctions against the Defendants.  ECF No. 96 at 1.  Defendants oppose Rech's motion.  ECF No. 100.

### A.  Recusal of United States Magistrate Judge Marian W. Payson

Rech moves under 28 U.S.C. § 455 to "recuse and disqualify" United States Magistrate Judge Marian W. Payson on several grounds.[6]  ECF No. 96 at 1.  In brief, he argues *inter alia* that recusal or disqualification is warranted because Judge Payson (1) presided over a criminal matter (including executing a warrant) in which he was the defendant during the pendency of the present civil case, which gave her access to information she otherwise would not have known;  (2) granted Defendants "numerous relief requests . . . via Ex Parte emails/personal letters over the duration of this case"; (3) "protect[ed] a friend . . . from not being named as a Defendant in the above captioned matter"; and (4) "express[ed] her concerns for a conflict of interest in [Rech's criminal case] multiple times on her own accord."  ECF No. 96 at 16-18.

 Under 28 U.S.C. § 455(a), "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  28 U.S.C. § 455(a).  Subsection (b) provides, *inter alia*, that a justice, judge or magistrate judge "shall . .  disqualify himself . . . [w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."  28 US.C. § 455(b).

The Court considers first whether it is proper for this Court to make this determination or whether it must be brought before Judge Payson.  The Second Circuit does not appear to have directly addressed this circumstance.  But it has directed that "[d]iscretion is confided in the district judge in the first instance to determine whether to disqualify himself."  *In re Drexel Burnham*

---

[6] Plaintiff makes several arguments in reliance on 28 U.S.C. § 455 as a basis for recusal.  He also makes passing reference to 28 U.S.C. § 144, which governs "[b]ias or prejudice of judge," but does not explain why that statute applies.  28 U.S.C. § 144.  "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."  *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).  Regardless, even if an argument under Section 144 were adequately developed, the Court would deny it as moot for the same reasons discussed below with respect to Section 455.

*Lambert Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988).  The reason for this principle is sound: "[t]he judge presiding over a case is in the best position to appreciate the implications of those matters alleged in a recusal motion," rather than an appellate court sitting in review.  *Id.*

Applied to the present scenario, this reasoning might tend to suggest that this Court should abstain from ruling on Rech's request *in lieu* of Judge Payson considering her recusal and disqualification.  *See Klayman v. Judicial Watch, Inc.*, 628 F. Supp. 2d 84, 90 (D.D.C. 2009) (stating that the principle that a district court judge, rather than an appellate panel, should make an initial determination on recusal "would . . . seem to counsel against" a district judge reviewing a litigant's motion to recuse a magistrate judge in the first instance).

Nonetheless, some district judges in this Circuit have made initial rulings on a motion to recuse a magistrate judge when presented with  situations similar to the one at hand.  *See Ralin v. City of New York*, 15-CV-02978, 2016 WL 3033720, at *2 (E.D.N.Y. May 25, 2016) (the district judge made an initial ruling on the plaintiff's motion to recuse herself and the magistrate judge); *178 East 80th Street Owners, Inc. v. Jenkins*, No. 00-Civ.-5959,  00-Civ.-6262, 01-Civ.-1814, 2003 WL 22004900, at *2 (S.D.N.Y. Aug. 22, 2003) (the district court denied the defendant's renewed motion to recuse the magistrate judge after having previously made an initial denial on that same issue).  Other courts presented with questions of magistrate-judge recusal have left the determination for magistrate judge consideration.  *See Adams v. New York State Educ. Dept.*, 752 F. Supp. 2d 418, 419, n.1 (S.D.N.Y. 2010) (the plaintiffs moved for recusal of the district judge and magistrate judge and each judge ruled on his own recusal).

Despite the lack of clear guidance in the relevant case law, the Court finds that the posture of this case permits a ruling by this Court on Judge Payson's recusal.  Furthermore, due to the

unique circumstances of this case, the Court need not reach the merits of Rech's motion in order to make such a ruling.

Pursuant to an order dated July 7, 2017, this case was referred to Judge Payson pursuant to 28 U.S.C. § 636(b)(1) (A) and (B) for "supervision of pre-trial discovery disputes"; "supervision of pre-trial discovery"; "supervision of settlement discussions"; "issuance of all pre-trial scheduling orders and amendments thereto, pursuant to Fed. R. Civ. P. 16"; "motions for appointment of counsel"; and "all non-dispositive motions or applications including those to amend the pleadings."  ECF No. 3 at 1.

Fact discovery in this case closed on November 30, 2020.  ECF No. 81.  Expert discovery closed on March 24, 2021.  ECF No. 85.  The deadlines for discovery-related motions have passed. *See* ECF No. 81.  Dispositive motions were due by June 30, 2021, and Defendants timely moved for summary judgment on May 25, 2021.  ECF No. 92.  That motion is presently before this Court and any trial, were there to be one, would proceed before this Court.  Thus, barring some unforeseen circumstances—such as a settlement conference or reopening of a discovery issue— Judge Payson's role in this case has concluded.

Accordingly, based on the present posture of this case, Rech's motion for recusal and disqualification of Judge Payson is DENIED AS MOOT. *See Ralin*, 2016 WL 3033720, at *2, n.2 (district court denied as moot motion to recuse magistrate judge where the case had been reassigned to a different magistrate judge for administrative reasons).  However, this denial is without prejudice and Rech may renew this motion in the event Judge Payson is required to make further rulings in this case.

### B. Fraud on the Court

Rech moves for an order finding that "this Court has committed the serious misconduct and violation of Fraud of [sic] the Court." ECF No. 96 at 1. The underpinnings for Rech's arguments that he is entitled to such an order are the same arguments he presents regarding recusal and disqualification. *See id.* at 16-18.

"'Fraud on the court' is fraud that affects the integrity of the process of adjudication." *King v. First American Investigations, Inc.*, 287 F.3d 91, 95 (2d Cir. 2002). "A movant claiming fraud upon the court bears the burden of proving the sanctionable conduct by clear and convincing evidence." *Garcia v. Griffin*, No. 16-CV-2584, 2021 WL 1577579, at *2 (S.D.N.Y. April 22, 2021) (internal quotations & citation omitted).

Federal Rule of Civil Procedure 60 governs claims of fraud on the court. *Id.* In pertinent part, Rule 60(b) provides that "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . fraud . . ., misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3). Rule 60(d) provides that "this rule does not limit a court's power to . . . set aside a judgment for fraud on the court." Fed. R. Civ. P. 60(d)(3). "The type of fraud upon the court that can sustain an independent action under Rule 60(d) is 'narrower in scope' than fraud upon the court claims brought under Rule 60(b), which allows for claims brought during the course of litigation." *Garcia*, 2021 WL 1577579, at *2 (citing *LinkCo, Inc. v. Naoyuki Akikusa*, 367 F. App'x 180, 182 (2d Cir. 2010) (summary order)).

Here, Rech does not specify a rule supporting his claim of fraud on the court. Nor does he seek relief from a judgment. The only relief he requests in his motion is recusal and disqualification of Judge Payson, sanctions against the Defendants, and leave to amend the Amended Complaint. ECF No. 96 at 1-2. He largely rehashes the grounds he believes support

recusal of Judge Payson as supporting "fraud on the Court." *See* ECF No. 96 at 16-18.  Because Rech is a *pro se* litigant, the Court has "liberally constru[ed] his briefs and read[ ] his submissions as raising the strongest arguments that they suggest." *Garcia*, 2021 WL 1577679, at *1 (citing *O'Neal v. Spota*, 744 F. App'x 35, 36 (2d Cir. 2018) (summary order)).   Nonetheless, "Plaintiff's status as a *pro se* litigant does not excuse him from the high burden of producing highly convincing evidence in support of his claim of fraud on the court." *Aneja v. M.A. Angeliades, Inc.*, No. 05 Civ. 9678, 2010 WL 199681, at *2 (S.D.N.Y. Jan. 12, 2010) (citation & internal quotation marks omitted).

Rech has failed to provide evidence to meet the stringent standard of fraud upon the Court. His allegations are conclusory and not supported by clear and convincing evidence.  Rech's motion for fraud on the Court is DENIED.

### C.  Amendment of Complaint

Pursuant to Federal Rule of Civil Procedure 15(a), a "court should freely give leave [to amend a pleading] when justice so requires." *Galland v. Johnston*, No. 14–cv–4411, 2015 WL 1290775, at *3 (S.D.N.Y. March 19, 2015)  "However, the Court should deny leave to amend if there is 'evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility.'" *Id.* (quoting *Milanese v. Rust–Oleum Corp.*, 244 F.3d 104, 110 (2d Cir.2001)).  Local Rule of Civil Procedure 15(a) provides that "[a] movant seeking to amend or supplement a pleading must attach an unsigned copy of the proposed amended pleading as an exhibit to the motion[.]" *Wi3, Inc. v. Actiontec Electrons., Inc.*, 71 F. Supp. 3d 358, 363 (W.D.N.Y. 2014) (quoting L.R. Civ. P. 15(a)).

Here, Rech seeks leave to amend his Amended Complaint to add as defendants Michele Crain and Christyn Musso.  ECF No. 96 at 1.  Defendants oppose this request.  ECF No. 100 at 2. Rech has failed to comply with Local Rule 15 and that alone is sufficient grounds to deny his

motion. *See Wi3, Inc.*, 71 F. Supp. at 363. However, even if the Court were to overlook this procedural flaw, it would deny Rech's motion as untimely.

Judge Payson entered a Scheduling Order pursuant to Federal Rule of Civil Procedure 16(b) on January 23, 2018. ECF No. 17. That Order set a deadline of April 4, 2018 for motions to amend the pleadings. *Id.* at 2. Rule 16(b) provides in pertinent part that "[a] schedule may be modified only for good cause." Fed. R. Civ. P. 16(b)(4). "[T]he Second Circuit has made it clear that the good cause standard of Rule 16 supersedes the more liberal standard of Rule 15(a) where, as here, a motion to amend is filed after the deadline for amended pleadings set by a court's scheduling order." *Collins v. Experian Credit Report*, No. 3:04CV1905, 2006 WL 3703414, at *1 (D. Conn. Dec. 14, 2006).

Rech fails to establish good cause, as is his burden under Rule 16. *See id.* Plus, nothing in his motion remotely suggests that these parties played a role in the alleged constitutional violations in 2016 which underlie his Complaint. *See generally* ECF No. 96. Accordingly, leave to amend to add Crain and Musso is DENIED.

### D. Sanctions

Rech's motion requests "sanctions against ALL Defendants as they have acted in bad faith; mislead the Plaintiff and this Court; [and] acted in the light of public corruptness." ECF No. 96 at 1. Defendants oppose this motion, arguing that "[Rech] has not shown any good reason in law or in fact why sanctions should be awarded." ECF No. 100 at 2. Rech previously moved for sanctions in this action and that motion was denied. ECF No. 82 at 7.

Federal Rule of Civil Procedure 37 "governs failure to make disclosures or to cooperate in discovery." *Houghtaling v. Eaton*, No. 6:14-CV-06416 EAW, 2021 WL 4204938, at *2 (W.D.N.Y. Sept. 13, 2021) (citing Fed. R. Civ. P. 37). "The district court may impose sanctions

when 'a party . . . fails to obey an order to provide or permit discovery.'" *Burns v. Imagine Films Ent., Inc.*, 164 F.R.D. 594, 598 (W.D.N.Y. 1996) (quoting Fed.R.Civ.P. 37(b)).

Here, Rech does not specify which Federal Rule of Civil Procedure he relies on in seeking sanctions, but the specific basis for his request against Defendants is that prior Defense counsel, Michele Crain,

> suppressed discovery to whom the Defendants' were advised by to intentionally violate Plaintiff's Fourth Amendment Rights on March 15, 2016. Due to legal motions and practice, Michele Romance Crain, Esq. was reluctantly forced to admit she was the culprit, as noted in Defendants' Second Supplemental Response to Plaintiff's First Set of Interrogatories dated January 9, 2000 (Exhibit A).

ECF No. 96 at 4. These conclusory allegations are not adequately developed through argument in such a way that permits this Court to undertake meaningful analysis. *See Zannino*, 895 F.2d at 17. The Court does not have a copy of "Defendants' Supplemental Response to Plaintiff's First Set of Interrogatories." Nor has the Court located any support for these assertions in the record. Accordingly, Rech's motion for sanctions is DENIED. *See Houghtaling*, 2021 WL 4204938, at *2 (denying Rule 37 sanctions where "Plaintiff has not provided support for his conclusory assertions that defense counsel is harassing him, and his assertions are not otherwise supported by the record.").

### E. Request to Reopen Discovery

Rech requests discovery be reopened in this case. His request is based on his assertion that the Defendants' declarations submitted in support summary judgment:

> offer new information for the first time to the Plaintiff, contradicts discovery and facts before this Court, and none of them indicate where they stood during the incident of March 15, 2016 (yet they all say the same thing). Thus, Plaintiff requests a continuance . . . to conduct further discovery as needed.

ECF No. 97 at 40-41. Defendants oppose this request. ECF No. 99-1 at 9-10.

The decision whether to reopen discovery is within a district court's discretion. *Moroughan v. Cnty. of Suffolk*, 320 F. Supp. 3d 511, 515 (E.D.N.Y. 2018). "A party seeking to reopen discovery bears the burden of establishing good cause and discovery should not be extended when there was ample opportunity to pursue the evidence during discovery." *Id.* (citation & internal quotation marks omitted).

Here, discovery in this case has been closed for approximately 14 months and the fact discovery deadline was November 30, 2020. ECF No. 81. Rech did not seek to extend that deadline. This case has been pending for approximately five years and Rech had ample time during discovery in this case to seek the information he is claiming to have learned for the first time in Defendants' declaration. Accordingly, Rech's motion to reopen discovery is DENIED.

## II.   Defendants' Motion for Summary Judgment

### A.  Legal Standard

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). However, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted). Where appropriate, a trial judge may dismiss claims "for failure to state a cause of action upon motion for summary judgment."

*Shabazz v. City of New York*, No. 15-CV-1324, 2021 WL 633748, at *2 (E.D.N.Y. Feb. 17, 2021) (quoting *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968)).

### B.  Defendant Monroe County

Defendants argue that all claims against Monroe County should be dismissed because Rech "has not alleged or shown any evidence of any policy or custom . . . that caused his alleged violation of rights or injuries." ECF No. 93-8 at 28.  Rech did not respond directly to this argument.

It is well settled that municipalities are not subject to *respondeat superior* or vicarious liability under § 1983 for the actions of their employees.  *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691 (1978).  To maintain a successful § 1983 action against a municipality or municipal employee sued in his or her official capacity, a plaintiff is required to establish: (1) the actions were taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages and (5) that an official policy of the municipality caused the constitutional injury.  *Id.* at 694.

Here, with respect to Monroe County, "[P]laintiff has not made allegations of a governmental custom or policy that would make the County liable under § 1983" and therefore all claims against Monroe County are DISMISSED.  *Finnan v. Ryan*, 357 F. App'x 331, 333 (2d Cir. 2009) (summary order).

### C.  Defendant MCSO

Defendants argue that the MCSCO must be dismissed as a Defendant because it is an administrative body of a municipality (Monroe County) and does not have its own legal identity. Therefore, Defendants argue, it cannot be sued.  ECF No. 93-8 at 28-29.  Rech did not respond to this argument.

"Federal courts apply state law to determine whether an entity has capacity to be sued." *Long v. Cnty. of Orleans*, 540 F. Supp. 3d 344, 350 (W.D.N.Y. 2021) (quoting *Andradez v. Orange Cnty. Sheriff's Off.*, No. 20-CV-2050 (PMH), 2020 WL 1819881, at *1 (S.D.N.Y. Apr. 10, 2020)). "Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality, and therefore, cannot sue or be sued." *Id.* (quoting *Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002)). County sheriff's departments are considered "administrative arms" of the County and, as such, "do not have a legal identity separate from the municipality and may not sue or be sued." *Jenkins v. Onondaga Cnty. Sheriff's Dep't*, No. 5:12-CV-855 GTS/ATB, 2012 WL 4491134, at *2 (N.D.N.Y. June 28, 2012). Accordingly, Rech cannot maintain his claims against the MCSO, and summary judgment is GRANTED as to this Defendant.

### D. Official Capacity Claims Against Individual Defendants

Rech sues Defendants Strollo, Fay, DeRuyter, Phillipp, Weber, and Wilczak in their individual and official capacities. ECF No. 31 at 1. Because Rech has not alleged *Monell* liability against Monroe County, "all claims against [Strollo, Fay, Deruyter, Phillipp, Weber, and Wilczak] in [their] official capacit[ies] are dismissed as redundant of those against the municipality."[7] *Yestifeev v. Steve*, 860 F. Supp. 2d 217, 224 (W.D.N.Y. 2012).

### E. Claims Arising from March 2016 Incident and Subsequent Detention

#### a. Unlawful Entry

Rech brings a claim for unlawful entry into his home pursuant to § 1983 and the Fourth Amendment. Defendants argue that this claim is not viable "because the Defendants have absolute quasi-judicial immunity, and because the Defendants have qualified immunity." ECF No. 93-8 at

---

[7] Claims against these Defendants in their individual capacities are analyzed below.

12-13.  In response, Rech argues that the dismissal of the State Charges in Monroe County

Supreme Court "determined Defendants' violated [his] Fourth Amendment rights, which DENIES

Defendants' assertion that they had probable cause and qualified immunity."  ECF No. 97 at 19

(capitalization in original).

Defendants do not argue that the Entry Order was valid to permit them entry into Rech's

home.  Rather, they argue that the officers' reliance on the Entry Order, which purported to

authorize them to "immediately enter" Rech's home, provided them with "probable cause to enter

the Rech's house to insure [sic] that his son was safe and to effectuate the transfer of his son to the

child's mother."  ECF No. 93-8 at 13.

"The Fourth Amendment protects the 'right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures.'"  *Kaminsky v. Shriro*, 243

F. Supp. 3d 221, 227 (D. Conn. 2017) (quoting U.S. Const. Amend. IV).  "A law enforcement

officer that reasonably relies on a facially valid warrant issued by a neutral and detached magistrate

is generally entitled to qualified immunity for such action."  *Cogswell v. Cnty. of Suffolk Deputy*

*Sheriff's Dep't*, 375 F. Supp. 2d 182, 187 (E.D.N.Y. 2005).  Thus, "[a]n officer can be immune

even when a search or seizure is 'technically unlawful,' as long as he acts reasonably."  *Coppola*

*v. Blarcum*,  No. 1:17-CV-1032, 2020 WL 6888051, at *8 (N.D.N.Y. Nov. 24, 2020).  "One

exception to this general rule is if there exists some reason to question the validity of the warrant."

*Id.*

A Family Court order may function as "the equivalent of a search warrant for Fourth

Amendment purposes" in certain circumstances.  *Shaheed v. Kroski*, NO. 5:18-CV-P6-GNS, 2018

WL 664984, at *2 (S.D.N.Y. Dec. 18, 2018) (internal quotation marks & citation omitted).  This

is so because "[t]he procedure for granting an order pursuant to [N.Y. Fam. Ct. Act § 1034(c)] [is]

the same as for a search warrant under . . . the criminal procedure law." *Shaheed v. City of New York*, 287 F. Supp. 3d 438, 450 n.8 (S.D.N.Y. 2018).

Here, the fact that the Entry Order was invalid is not dispositive of the question of qualified immunity. Defendants do not argue that the Entry Order was a valid search warrant or a functional equivalent issued by a family court judge. Rather, the issue is whether DeRuyter and Phillipp, who entered Rech's home in reliance on the Entry Order, are entitled to qualified immunity—and thus excused from liability for their unlawful entry in violation of Rech's Fourth Amendment rights.

The undisputed facts demonstrate that DeRuyter and Phillipp reasonably believed that the Entry Order permitted entry into Rech's home. First, the language of the Entry Order itself supports this finding. The Entry Order stated: "the Monroe County Sheriff's Office is directed and authorized to immediately enter [Rech's] home . . . to effectuate the return of [LR] to [Szczublewski]." A reasonable officer in this circumstance would have understood this language as granting him or her the authority to enter Rech's home.

Further, there are no facts in the record that suggest DeRuyter or Phillipp had reason to question the Entry Order. Nor did they have any reason to question Justice Owens's authority for issuing such an Entry Order and they therefore reasonably relied on it. *See Coppola*, 2020 WL 6888051, at *8 (finding qualified immunity where officer reasonably relied on directives of mental health clinician though that individual did not have actual authority to invoke the statute in question).

Moreover, DeRuyter "consulted with [his] Lieutenant and Captain and was ordered to comply with the [Entry Order] and enter the home to remove the child." ECF No. 93-3 at 3. "The Second Circuit has held that a subordinate officer is entitled to qualified immunity when he relies

25

on a supervisor's 'apparently valid' order." *Coppola*, 2020 WL 6888051, at *9 (citing *Varrone v. Bilotti*, 123 F.3d 75, 82 (2d Cir. 1997)).

Because Defendants DeRuyter and Phillipp reasonably relied on Justice Owens's Entry Order—notwithstanding its invalidity—qualified immunity protects them from liability for unlawful entry. *See United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018) (finding good-faith exception to the exclusionary rule applied where investigators reasonably relied on a court order). The Court therefore GRANTS summary judgment to DeRuyter and Phillip on this claim.

### b. False Arrest

Rech alleges that his arrest during the March 15, 2016 incident was unlawful. ECF No. 31 at 12. Defendants move for summary judgment on this claim. ECF No. 93-8 at 17.

"The Fourth Amendment . . . prohibits unreasonable seizures in the form of arrests without probable cause." *Frederique v. Cnty. of Nassau*, 168 F. Supp. 3d 455, 475 (E.D.N.Y. 2016). When scrutinizing a claim for false arrest under Section 1983, "federal courts look to the law of the state in which the arrest occurred." *Id.* (quoting *Hoyos v. City of New York*, 999 F. Supp. 2d 375, 385 (E.D.N.Y. 2013)).

In New York, establishing a false arrest claim requires the plaintiff to show: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Id.* (quoting *Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir.2003)). "Because probable cause to arrest constitutes justification, there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff." *Rivera v. City of Rochester*, No. 09–CV–6621, 2015 WL 409812, at *4 (W.D.N.Y. Jan. 29, 2015).

However, "[e]ven if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest." *Id.* "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)). Accordingly, the test for qualified immunity "is more favorable to the officers than the one or probable cause; 'arguable probable cause' will suffice to confer qualified immunity." *Id.*

"On summary judgment, the existence of probable cause or arguable probable cause may be determined as a matter of law where 'there is no dispute as to the pertinent events and the knowledge of the officers.'" *Shaheed*, 287 F. Supp. 3d at 449 (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).

Here, Rech was charged with, *inter alia*, Obstructing Governmental Administration in the Second Degree, NY Penal Law 195.05. ECF No. 93-1 at 8. "[T]he elements of the crime are: (1) intent; (2) preventing or attempting to prevent the performance of an official function; by (3) intimidation, physical force, or interference." *Shaheed*, 287 F. Supp. 3d at 449. DeRuyter and Phillipp were in possession of the Entry Order which they believed lawfully permitted them to enter the residence to secure LR. It was objectively reasonable for them here to believe that the Entry Order permitted them to enter the home. The Entry Order stated: "the Monroe County Sheriff's Office is directed and authorized to immediately enter [Rech's] home . . . to effectuate the return of [LR] to [Szczublewski]." When Rech refused to permit DeRuyter and Phillipp to carry out that order, Rech "reasonably could have been understood by an arresting officer to have obstructed the officers' entry through interference." *Shaheed*, 287 F. Supp. 3d at 450.

There is no dispute that DeRuyter and Phillipp believed they were carrying out "an entry order akin to a warrant," signed by a judge, which permitted them entry into the home. *See id.* They had "announced their intention to execute that order" to Rech. *Id.* Based on these undisputed facts, it was objectively reasonable for DeRuyter and Phillipp to believe they had probable cause— thus "arguable probable cause" existed notwithstanding the invalidity of the Entry Order. DeRuyter and Phillipp are entitled to qualified immunity. Summary judgment is GRANTED as to Plaintiff's claim for false arrest.

### c. Excessive Force

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *LeFever v. Clarke*, 525 F. Supp. 3d 305, 331 (N.D.N.Y. 2021) (citation omitted). "To succeed on a § 1983 excessive force claim, a plaintiff must show that the defendant's use of force was objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (citation & internal quotation marks omitted). This "fact-specific inquiry" is informed by factors that include "the severity of the security problem at issue," the threat "reasonably perceived by the officer," and "whether the plaintiff was actively resisting." *Id.* (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).

"It is well established that qualified immunity may operate as a defense to excessive force claims." *Betts v. Rodriguez*, 15-CV-3836, 2017 WL 2124443, at *4 (S.D.N.Y. May 15, 2017) (citation & internal quotation marks omitted). The operative question in determining whether qualified immunity shields an officer from liability in the excessive force context "is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." *Id.* (quoting *Read v. Town of Suffern Police Dep't*, No. 10 Civ. 9042,

2013 WL 3193413, at *7 (S.D.N.Y. June 25, 2013)).  "If a genuine issue of material fact exists regarding the reasonableness of the officer's conduct, summary judgment must be denied." *Id.*

Here, the undisputed factual record and, importantly, the audio recording, indicate that Rech failed to cooperate with DeRuyter's requests to pat him down despite informing DeRuyter that he was in possession of a knife.  "When the circumstances give rise to reasonable suspicion that a suspect has a weapon, an officer need not rule out alternative explanations—whether innocent or otherwise—for a suspect's behavior before deciding to conduct a pat-down for his safety." *United States v. Weaver*, 9 F.4th 129, 134 (2d Cir. 2021).  Rech also refused to permit DeRuyter and Phillipp to carry out what they believed was a lawful order.  DeRuyter was aware of Rech's prior antagonistic attitude toward officers.  Therefore, DeRuyter, having reasonable suspicion that Rech had a knife based on his own admission, was entitled to pat him down for officer safety.

Once DeRuyter attempted to perform a pat-down and Rech resisted, a struggle ensued which resulted in DeRuyter pulling Rech toward the floor by his arm.  Regardless of the legality of the pat-down  (which the Court finds to have been legal), Rech's conduct provided officers with probable cause for the arrest once he struggled, resisted, and punched an officer. *See United States v. Crump*, 62 F. Supp. 2d 560, 569 (D. Conn. 1999).

Once Rech punched an officer, the use of the knee strike, hooking maneuver, and other force used by DeRuyter and Phillipp became objectively reasonable. *See Brown v. City of New York*, 798 F.3d 94, 107 (2d Cir. 2015) ("When a suspect resists arrest, [t]he force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer.") (alteration in original) (internal quotation marks & citation omitted).  Even if the Court were to credit Rech's bare assertion that

the officers had their guns drawn (despite there being no support for that assertion elsewhere in the written record or audio that this was the case) that dispute, standing alone would not be sufficient to create an issue of material fact to preclude summary judgment. *See Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 296 (S.D.N.Y. 2015) (collecting cases).

Furthermore, even accepting Rech's account regarding the extent of his injuries as true despite his documented refusal of medical treatment at C Zone Substation, injury is only one factor that must be considered in the overall "reasonableness" inquiry. Here, the force used by DeRuyter and Phillipp was reasonable under the circumstances and that is the dispositive question. *See Sash v. United States*, 674 F. Supp. 2d 531, 539 (S.D.N.Y. 2009) ("Just as reasonable force is not unconstitutional even if it causes serious injury, neither does unreasonable force become immunized from challenge because it causes only minor injury."). Accordingly, Defendants' motion for summary judgment on Rech's false arrest claim is GRANTED.

### d. False Imprisonment, Unlawful Search of Home, Unlawful Seizure of Keys to Home and Car, Unlawful Seizure of Eyeglasses and Denial of Phone Call

"In order to maintain an action . . . under . . . section 1983, a plaintiff must establish specific facts demonstrating that defendant's personal involvement in the constitutional violations alleged." *Betts*, 2017 WL 2124443, at *3 (quoting *Dockery v. Tucker*, No. 97-CV-3584, 2006 WL 5893295, at *13 (E.D.N.Y. Sept. 6, 2006)) (internal quotation marks omitted). "Such personal involvement may be demonstrated by proof of the defendant's direct participation in the alleged violation." *Id.* (citation & internal quotation marks omitted). "A plaintiff seeking to prove that an officer directly participated in the alleged excessive force need not be able to positively identify, at trial, which defendant took what particular action." *Id.* Instead, it is sufficient for a jury to "use a combination of factors—direct testimony, cross examination, and circumstantial evidence—to infer that a particular defendant took a particular action." *Id.* Accordingly, "[a]t the summary

judgment stage, the question is whether, viewing the evidence in the light most favorable to the non-moving party, a reasonable juror could find direct participation." *Id.*

Here, Rech alludes to claims for false imprisonment, unlawful search of home, unlawful transportation of LR, unlawful seizure of keys to his home and car, unlawful seizure of eyeglasses and denial of a phone call while detained. *See* ECF No. 31 at 4-6. Summary judgment as to these claims is GRANTED as Rech has failed to marshal any evidence regarding which Defendants were involved in these violations, or any evidence which assists the Court in the factual development of these claims.

### e. Negligent Infliction of Emotional Distress and Intentional Infliction of Emotional Distress under 42 U.S.C. § 1983

Rech's Amended Complaint makes passing reference to claims for negligent infliction of emotional distress and intentional infliction of emotional distress. ECF No. 31 at 3. It is not clear from the Amended Complaint whether such claims arise under federal or state law.

The Court considers here these claims in the context of 42 U.S.C. § 1983 and addresses them in the state law context below. Defendants are entitled to judgment as a matter of law, as intentional infliction of emotional distress "is not a cognizable constitutional claim." *Anderson v. City of New York*, No. 13 Civ. 1745, 2013 WL 6182675, at *3 & n.5 (S.D.N.Y. Nov. 19, 2013). "Similarly, [Rech's] § 1983 claim for negligent infliction of emotional distress fails because 'mere negligence is insufficient as a matter of law to state a claim under section 1983.'" *Id.* (quoting *Poe v. Leonard*, 282 F.3d 123, 145 (2d Cir. 2002)). Accordingly, summary judgment is GRANTED as to these claims.

### f. Defendant Fay

Defendants argue that Fay should be dismissed from the suit "because Lt. Fay was not personally involved in the alleged incidents." ECF No. 93-8 at 27.

"[I]t is well settled that '[a] plaintiff asserting a Section 1983 claim against a supervisory official in his individual capacity must show that the supervisor was personally involved in the alleged constitutional deprivation.'" *Yestifeev*, 860 F. Supp. 2d at 224 (quoting *Rodgers v. City of Rochester*, No. 05–CV–6220T, 2007 WL 1557465 at *8 (W.D.N.Y.2007)).

Here, Defendants attached to their motion a signed declaration from Fay.  ECF No. 93-5. In his declaration, Fay avers that he did not participate in Rech's arrest at his home and was not involved in the use of force against Rech.[8]  *Id.* at 2  Fay's only involvement with Rech was when he discussed with him the officers' use of force while Rech was in a holding cell at the police station.  *Id.*  In his capacity as Lieutenant, Fay took down Rech's version of events and asked if he was injured and needed medical treatment.  *Id.*  Fay completed an investigation of the use of force incident and prepared a "Subject Management Justification Report" in order to determine if the officers' use of force was justified.  *Id.*  Fay further averred that he was not involved in the removal of firearms from Rech's home, nor has he ever been involved in an arrest of Rech or use of force on him.  *Id.*

Based on these undisputed facts, none of Rech's claims allege that Fay was personally involved in an alleged constitutional deprivation, and his status as a supervisory Lieutenant alone is not a sufficient basis for liability.  *See Yestifeev*, 860 F. Supp. 2d at 224.  Accordingly, Defendants' motion for summary judgment as to Defendant Fay is GRANTED and Fay is DISMISSED from this case.

---

[8] In response to Fay's affirmation that he was not present, Rech states "that there exists a genuine issue to be tried as Plaintiff has no direct knowledge of this statement, there were dozens of Deputies at Plaintiff's home . . . ."  ECF No. 97 at 11.  However, Rech has marshalled no evidence to suggest that Fay *was* present and his lack of knowledge is insufficient to raise a factual dispute.

### F. Claims Arising from State Court Prosecution

#### a. Defendant Strollo

Defendants argue that all claims against Defendant Strollo should be dismissed based on absolute prosecutorial immunity and qualified immunity.  ECF No. 93-8 at 26.

"Prosecutors are entitled to absolute immunity when they engage in activities intimately associated with the judicial phase of the criminal process." *Kent v. Cardone*, 404 F. App'x 540, 542 (2d Cir. 2011) (summary order) (citation & internal quotation marks omitted).  Thus, "[t]he doctrine of 'absolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate.'" *Buari v. City of New York*, 530 F. Supp. 3d 356, 378 (S.D.N.Y. 2021) (quoting *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)).

Here, Rech alleges that Strollo, while acting as ADA, tried to "have a motion be heard behind the Plaintiff's back" because he did not provide adequate notice "at least 8 days before a motion is to be heard" during the state court proceedings.  ECF No. 31 at 7.  Rech also alleges that Strollo told "a bold face lie" regarding when he received certain transcripts because he stated in an affirmation in state court that "he made multiple attempts to obtain the transcripts, with no proof of such attempts."  *Id.* at 8.

In addition, Rech asserts that Strollo improperly communicated *ex parte* with the court in the state court proceedings and that "[t]o date, [he] has ONLY received NON-CERTIFIED transcripts on March 2, 2017 from [Strollo].  All Four (4) sets of transcripts are NOT signed and NOT certified."  *Id.* at 9 (capitalization in original).  Finally, Rech alleges that Strollo misled the state court and Rech  about when he received certain transcripts and that Strollo "intentionally and maliciously lied in his Affirmation before the Appeals Court for his own self-interest and to prejudice the Plaintiff."  *Id.* at 10.

"The scope of the prosecutor's jurisdiction is determined by law." *Shmueli v. New York*, 424 F.3d 231, 237 (2d Cir. 2005). Here, there no facts in the records which indicate that Strollo was acting outside the scope of his prosecutorial jurisdiction. In such a situation, absolute immunity "even extends to the falsification of evidence and the coercion of witnesses, the knowing use of perjured testimony, the deliberate withholding of exculpatory information, the making [of] false or defamatory statements in judicial proceedings, and conspiring to present false evidence at a criminal trial." *Buari*, 530 F. Supp. 3d at 378 (citations & internal quotation marks omitted) (alteration in original).

Accordingly, Rech's claims against Strollo fail and Defendants' motion for summary as to such claims is GRANTED.

### b. Officer Testimony

Rech's Amended Complaint alleges that unspecified members of the MCSO "committed perjury, altered and falsified documents, defamed and slandered the Plaintiff under oath, in the Monroe County Supreme Court, to reflect a negative view of the Plaintiff over full custody of his minor son."[9] ECF No. 31 at 7. Defendants move for summary judgment on these claims arguing that claims based on Defendants' testimony cannot stand because Defendants are entitled to absolute immunity.

"[O]fficers are, as a matter of law, 'absolutely immune from a section 1983 claim that [they] testified falsely' at adversarial proceedings." *Yevstifeev*, 860 F. Supp. 2d at 224-25 (quoting *Dukes v. New York*, 743 F. Supp. 1037, 1044 (S.D.N.Y. 1990)). In addition, "[Rech] [has] failed to produce any evidence that the officers' testimony was false in any material respect." *Id.*

---

[9] Though Rech does not specify which Defendant or Defendants he brings this claim against, Defendants submitted a declaration from Defendant Deruyter which indicates that he testified in a contempt proceeding related to Rech's child custody case. ECF No. 93-3 at 8.

Likewise, he has failed to produce evidence that Defendants slandered him or falsified evidence used against him. Accordingly, summary judgment as to this claim is GRANTED and this claim is DISMISSED.

### G. Claims Arising from July 2016 Incident

Defendants argue that Rech's claims against Weber and Wilczak stemming from the July 2016 incident should be dismissed for failure to state a claim. ECF No. 93-8 at 25.

The Court considers first whether this incident could give rise to a Fourth Amendment claim since Weber and Wilczak state in their declarations that they entered onto Rech's property during their investigation. ECF No. 93-7 at 4; ECF No. 93-6 at 3. It is "clearly established . . . that a fenced-in backyard is 'curtilage' entitled to Fourth Amendment protection." *Brocuglio v. Proulx*, 67 F. App'x 58, 60-61 (2d Cir. 2003) (summary order).

Here, Rech has not developed any facts or submitted any evidence that would suggest Weber and Wilczak intruded on an area in which he enjoys a reasonable expectation of privacy. For example, there is nothing in the record that indicates the officers entered into the backyard. Or that the area they stood on to look over the fence was part of Rech's curtilage. Rech has not marshalled sufficient evidence from which a reasonable jury could find a Fourth Amendment violation. Furthermore, merely looking over Rech's fence during their investigation did not violate Rech's Fourth Amendment rights. *See Thomas v. City of Palm* Coast, 2017 WL 1179961, at *6 (M.D. Fla. March 30, 2017) ("[C]ode officers violated no Fourth Amendment right by looking over the fence, especially given that Plaintiffs did not allege that the officers were looking from a vantage point where they did not have the right to be.") . Accordingly, summary judgment is GRANTED as to any Fourth Amendment claims arising from this incident.

The Court considers next Rech's assertions that Wilczak and Weber "had guns drawn and refused to identify themselves"; that they "damaged [his] property and then retaliated using their police car in a threatening manner."  ECF No. 97 at 15.  These allegations were not in Rech's Amended Complaint and were raised for the first time in Rech's response to Defendants' motion.  Furthermore, there is no factual support for these conclusory assertions in the record.

Accordingly, these allegations are not properly before the Court and are insufficient to raise an issue of disputed fact or support a claim.  *See Kampfer v. Argotsinger*, No. 1:18-CV-0007, 2020 WL 906274, at *10 (N.D.N.Y. Feb. 25, 2020) ("These allegations are not found in the Amended Complaint and therefore are inappropriate to include in summary judgment briefing."); *see also Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99-CV-10452, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the [summary judgment] motion.").  Defendants' motion for summary judgment as to these claims is GRANTED.

## H.  Second Amendment Violation

Rech's Amended Complaint alleges a violation of his Second Amendment rights, stating as follows:

> [S]ubsequently after March 15, 2016 – occurrence by the Defendant's initiating the intentional and malicious submission of false documents, false information, and an unlawful petition that allegedly would result in the removal of firearms from Plaintiff without just cause.  This attack against the Plaintiff was solely the result of the Defendant's actions March 15, 2016.  By doing such acts as describe above, Defendants caused and/or permitted the violation of Plaintiff's rights guaranteed by the Second Amendment, thereby entitling Plaintiff to recover damages pursuant to 42 U.S.C. 1983.

ECF No. 31 at 13.  Defendants move for summary judgment on this claim, arguing that Rech has failed to marshal any evidence in support of this claim.

The Court agrees.  There are no facts in the records supporting this claim.  The declarations of Defendants Phillipp, Deruyter, Fay, Weber, and Wilczak all affirmatively state that they had no involvement in a petition related to a firearm or the removal of a firearm from Rech's home.  ECF No. 93-3 at 8; ECF No. 93-4 at 7; ECF No. 93-5 at 4; ECF No. 93-6 at 4; ECF No. 93-7 at 4.  These statements are undisputed in the record and uncontested by Rech's declaration.  ECF No. 97 at 17-19.

"Where damages are sought in a section 1983 action, the defendant must be responsible for the alleged constitutional deprivation."  *Kaminsky*, 243 F. Supp. 3d at 232  (quoting *Al–Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989)).  "Since liability cannot attach under the doctrine of *respondeat superior*, we must look instead to the extent of [Defendant]'s involvement in the unconstitutional conduct alleged."  *Id.*  Because Rech has presented no evidence supporting his allegation that the Defendants were involved in the petition for removal of, and the removal of, firearms from his home, the Court GRANTS summary judgment on this claim as to all Defendants.[10]

## I.   Miscellaneous Claims

Rech vaguely "asserts causes of action of . . . personal injury, damage and loss of property, Brady violation, [and] targeting and harassing Plaintiff and his minor son."  ECF No. 31 at 3.  He also references claims related to "endangering the welfare" of his son, LR, based upon officers "transporting said child in an unsafe and unlawful manner[.]"  *Id.* at 4.

To the extent these claims have not been disposed of in the analysis above, they are dismissed as standalone claims as Rech provides no admissible evidence to support them.  *See Yestifeev v. Steve*, 860 F. Supp. 2d 217, 223-24 (W.D.N.Y. 2012).

---

[10] The Court's analysis and conclusion would remain unchanged if Rech had presented his claim as one for unlawful seizure of his firearms under the Fourth Amendment.

### J.  Doe Defendants

Rech's Amended Complaint brings claims against "other unknown employees of Monroe County and MCSO."  ECF No. 31 at 1.  Here, Rech has had ample opportunity for discovery in this case, which has been pending for almost five years.  He does not indicate any efforts he has made to ascertain the identifies of these unnamed defendants.

"[W]]here a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the [defendant's] name, . . . the plaintiff simply cannot continue to maintain a suit against the John Doe defendant."  *Cruz v. City of New York*, 232 F. Supp. 3d 438, 448 (S.D.N.Y. 2017).  Accordingly, Rech's claims against unknown employees of Monroe County and the MCSO are DISMISSED.

### K.  State-Law Claims for Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress

The only remaining claims are Rech's state-law claims for intentional infliction of emotional distress against DeRuyter and Phillipp.  As a result, there arises a threshold jurisdictional issue.   Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over claims where, as here, it has "dismissed all claims over which it has original jurisdiction."   In evaluating whether to dismiss supplemental claims, a court balances the "traditional values of judicial economy, convenience, fairness, and comity."  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (internal quotation marks omitted). Generally, when federal-law claims are "eliminated before trial, the balance of factors will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (internal ellipses omitted).

Having considered the factors, the Court discerns no exceptional circumstance that would distinguish this case from the "usual case" where a district court should decline to exercise

jurisdiction. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  The issues presented in Rech's remaining claims implicate no federal policy concerns and since discovery is complete "the parties are equipped to present [those] question[s] to a state court expeditiously."  *Martin v. Sprint United Mgmt. Co.*, No. 15 Civ. 5237, 2017 WL 5028621, at *4 (S.D.N.Y. Oct. 31, 2017).

Nevertheless, the Second Circuit has cautioned that state-law claims should not be dismissed without giving the parties notice and an opportunity to be heard.  *See Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 83 (2d Cir. 2018) ("Hearing from the parties . . . is typically an essential component of the inquiry into whether to decline to exercise supplemental jurisdiction . . . .").  Accordingly, if they would like to do so, the parties have until April 15, 2022 to submit briefs up to five pages in length on the issue of supplemental jurisdiction.  In the absence of any submissions, the Court will dismiss the remaining claims without prejudice in accordance with the above analysis.

Therefore, Defendants' motion for summary judgment is DENIED WITHOUT PREJUDICE with respect to the state-law claims against DeRuyter and Phillipp.  The Court will consider the merits of Defendants' motion if it is persuaded, after briefing, that it should exercise supplemental jurisdiction in this case

**CONCLUSION**

For the reasons discussed above, Rech's omnibus motion, ECF No. 96, ECF No. 97, is

DENIED.  Defendants' motion for summary judgment, ECF No. 93, is GRANTED IN PART and

DENIED IN PART WITHOUT PREJUDICE.

IT IS SO ORDERED.

Dated: March 14, 2022
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York